The next case today is Brenda K. Tait v. Bridgewater State University et al. Appeal number 18-1229. Attorney Barkay, please introduce yourself on the record for us. May it please the court, Giotam Barkay, appointed counsel, appearing on behalf of plaintiff appellant Brenda Tait. I would like to, if I may, request three minutes of time for rebuttal. Yes, you may. Thank you. This case concerns the application of the McDonnell-Douglas burden-shifting framework for evaluating Title VII claims of employment discrimination. My client, Ms. Tait, is an African-American woman who applied for a position with Bridgewater State University, or BSU, for which she was extremely well qualified. Ms. Tait was rejected. Instead, BSU hired Jocelyn Frawley, a white applicant with far less experience and far inferior credentials who did not meet BSU's own stated requirements for the position. Based on that overwhelming disparity in the applicant's qualifications, a reasonable jury could find that BSU's proffered reason for its hiring decision was pretextual and that BSU instead acted out of discriminatory animus. There are, thus, genuine issues of material fact precluding summary judgment on Ms. Tait's Title VII claim. The district court's grant of summary judgment was therefore improper. The district court should be reversed. I would like to, if I may, turn first to the second prong of the McDonnell-Douglas burden-shifting framework, since in this case BSU concedes that Ms. Tait stated a prima facie claim. On the second part of the burden-shifting framework under McDonnell- Douglas, BSU is required to establish a legitimate non-discriminatory reason for its hiring decision. Counsel, even if they did, then the question becomes whether that's pretext, and it's a little hard to say that the conclusion of the hearing committee was not a non-discriminatory statement. But on the question of pretext, I'm struck by the fact that the rejection letter says, well, we rejected you because the other candidate is better qualified. Whereas when I look at this record, whether or not the woman who got the job was qualified, it is very hard for me to say that she is better qualified than your client. So if you wouldn't mind, on the pretext issue, could you talk through what you think the material issues of fact are? Thank you, Judge Lynch. Yes, I'd be happy to turn to that issue. So the case law is clear in this and other circuits that where there is an extreme disparity in qualifications and the proffered reason for a hiring decision is the applicant's qualifications as compared to the plaintiff's qualifications as compared to the successful applicant, that extreme gap in qualifications is sufficient to be the genuine issue of material facts. Can I ask you a question? Are those cases that involve an interview process or a mock job? Because that's the intervening thing. And I guess the one question is whether the word qualified in the letter is a reference to their paper qualifications or a reference to their overall performance through the whole application process. If it's the latter, then to me what matters is what we make of the evaluation of the performance during the interview process. Judge Barron, some of those cases involve an interview process and some of them don't. Our argument here centrally, first and foremost, has to do with the paper qualifications of Ms. Tate as opposed to Ms. Frawley being overwhelmingly, that Ms. Tate was overwhelmingly better qualified than Ms. Frawley. Are you saying that there's a fact question as to whether Ms. Frawley was qualified at all? Yes, Your Honor. We are saying that there's a fact question. I can see how if there's a factual question on that, it's clear to me how you would say there's a jury question overall. If there's not a fact question on that, if we disagreed with you on that point, could you just walk me through how we're supposed to think about a situation in which there's disparate paper qualifications, but then a record of interview performance that strongly favors the other candidate? Because just so I laid out on the table that the slight worry would be is if we say that goes to the jury in every case, then basically as long as the most minimally qualified person is up against the most qualified person, there's always the prospect that it's just going to have to go to a jury from the get-go. That doesn't seem obvious to me that that makes sense. In answering that, could you also fold in what you are alleging to be true? Yes. So I can certainly answer both of those questions, and I can see the concern, Judge Barron. And I do think that you don't often see a situation where there is an applicant who is so clearly, in our view, does not meet the qualifications, who nonetheless makes it through to the interview process such that there is then this question of the interview performance. To address the piece of it raised by Judge Thompson, first, on the interview performance, there are positives and negatives in both of the sets of interview reports. And the analysis here is very much a fact-intensive analysis where it's not just a question of who had a slightly higher average rating than the other. In this case, we would concede Ms. Frawley had the slightly higher rating as we would need to concede. She had that. But when you combine the fact that there are both positives and negatives in both sets of interview reports with the fact that Ms. Tate was clearly better qualified on paper given her years of education experience, her years of employment experience, and Ms. Frawley's comparative lack of experience, combine those two things, as well as the fact that Ms. Frawley was the only white applicant of the five finalists who were invited in after a set of phone interviews, combine all of that with the statement that Ms. Tate was not a good fit for the position. Now you're talking, Judge Barron, not about a situation where we're sending a question to the jury solely based on comparative paper qualifications where maybe they're a little bit closer. Mr. Barkay, I think you left out some facts that appear in your brief. One is a statement by one of the interviewers as to how your client answered two questions. She says flatly, that is not true. I take it there was no recording of this. Another factual issue has to do with what she was instructed not to talk about in the interview. And therefore, how she shaped her answers. But no similar guidance, if you will, was given to the white candidate who did not operate under those constraints. There may be other things as well, but I thought those were pertinent to your argument. Yes, Judge Lynch, thank you. We of course agree that those are pertinent to the analysis. Four minutes remaining. Thank you. And I didn't mean with my list before to make those exclusive as opposed to what we also cite in the brief. We agree that all of that supports the proposition that this is a case that should go to the jury. And we would also note that this was a case with a factual record on summary judgment that was perhaps not as fully developed as it could have been given that this was a pro se plaintiff, which is also something to consider here. So yes, absolutely. I mean, I think Judge Lynch, that the facts that you raised just now, combined with the facts that I described before, go to show why this is not a case that Judge Barron, as you noted, might lead us to a slippery slope concern that every case involving slightly differing comparative qualifications is one that should go to the jury. My concern is that every case involving sharply disparate ones would have to go to the jury no matter what the interview showed. I think Judge Lynch's questions were meant to suggest that we can read the record, or you're arguing we can read the record to say that the interview itself is a lot less conclusive. It's much more disputed. Fair enough, Judge Barron. And yes, that's absolutely right. My client squarely disputes several assertions that BSU makes in support of summary judgment on which the district court relied. And that supports, again, that this is a case involving genuine issues of material fact that should be tried to a jury and not decided on summary judgment. Unless there are further questions, I'm happy to address the remainder on rebuttal. We would ask that this court reverse the district court and remand the case to trial for trial. Thank you. Thank you. Thank you, Mr. Barkai. If you could mute your device at this time, and Mr. Lucia, if you could please unmute your device and introduce yourself on the record. Thanks, Dan. Good morning, and may it please the court. Massachusetts Assistant Attorney General Joe Lucia for Defendant Appelee's Bridgewater State University Board of Trustees and Bridgewater State University Office of Equal Opportunity, or the BSU for short. May I proceed, Your Honor? Please. This court can and should affirm the dismissal of plaintiff Brenda Tate's Title VII race discrimination claim because, as demonstrated by the undisputed facts in the summary judgment record, BSU had legitimate non-discriminatory reasons for hiring Jocelyn Frawley rather than Ms. Tate for the position of Staff Associate Equal Opportunity Title IX Investigator, and Ms. Tate failed to induce any evidence that those reasons were pretextual and that the real reason was discrimination. I'll address prong two first. With respect to the second phase of this analysis, BSU did... Wait a minute. Let me answer this. I mean, we have said that explanations that seem implausible can mean that that demonstrates pretext. On this record, given at least the paper qualifications and the disputed facts at the interview process, why does it mean that your client wins? Thank you, Judge Thompson. I would state in response to that question that there is no disputed material fact as to what Ms. Frawley's qualifications were. Those are made clear in documents and in the record, and from the record, it is clear that she met the required qualifications for this job. Counsel, pardon me, but you're going back to an argument that's non-responsive to Judge Thompson's question. Let's assume she meets the technical requirements. Nonetheless, we have the fact that the declination letter to her says, this other woman was better qualified, and we have the fact that it goes to an interview and the interview appears to have been dispositive, but there are some disputed material facts about that interview process, at which point the issue doesn't become an issue about whether the woman who got the job met the basic qualifications. It turns into something else, and we have assertions that there are material facts about the interview process. I outlined three of them that are contested and that her argument should go to a jury. I thought you were starting this with a different evidence that race is what influenced the interview process. Did I misunderstand? I would certainly agree with you, Judge Lynch, that there is no evidence in this record, neither direct nor circumstantial, that would suggest that race played any role. I did not say that. I said I understood that was your contention. Okay, now could you tell us why that's your contention? Given all of the interviewers were white, there is a dispute about whether what this black woman said at the interview is, in fact, accurately recounted. She says, no, that's an outright misrepresentation. So, if I understand your question correctly, Ms. Tate does claim that the record evidence contains a genuine dispute about whether, for example, she improperly announced her investigatory conclusion during the mock interview or whether she failed to elicit certain statements during the mock interview that the panelists maybe expected her to elicit. Ms. Tate denies that those things ever happened, and thus she argued that the court should not have credited them as true. There is no genuine dispute in this case about those pieces of evidence. What matters on summary judgment is not whether Ms. Tate did, in fact, improperly announce the investigation outcome during the mock interview or fail to elicit the sought-after statements. What matters is whether the panelists honestly believed that she had done so genuinely. I would cite to the First Circuit's decision in Espinal, where it is stated on summary judgment, the court's task is limited to determining whether the employer believed in the accuracy. This is kind of an on-off thing. In other words, how could they have believed she made that disclosure if there's no evidence she made it? Her contention is I never said that. There was no moment at which I disclosed my bias in that way. I apologize for interrupting. The record evidence, Your Honor, if you would look at the evaluation notes, includes notes that she did make those disclosures. And she says she didn't, so why wouldn't that be just a fact dispute? In other words, it's not the situation where there's agreement on what was said by her, and then there's a dispute over how to characterize or understand what she said. She's saying I did not say X. They're saying you did say X, therefore we concluded Y. Well, either she did or she didn't. There's no argument that if she didn't say it, they nonetheless believed she said it. So I hear what you're saying, Your Honor, and I believe that does go to the issue in prong two, whether it's a legitimate non-discriminatory reason as stated by the court. If this is a disputed issue of fact, the question being whether it's material. And I think insofar as the burden on phase two rests with the employer, it is a burden of production alone. And they have met that burden where they have pointed out all of the multifactored reasons why they believe that Ms. Frawley was more qualified. And I think the reason why it doesn't matter in the ultimate analysis is because when you do get to prong three, Your Honor, in this three-phase framework, what you discover is that the requisite standard upon which this case will rise and fall. I think this just goes to Judge Thompson's question about implausibility, which is they asserted a non-discriminatory reason. But if it's an implausible reason, that can be evidence of it being pretextual. And one of the grounds for finding it to be implausible is that the evidence on which it rests on is disputed. In other words, what makes it plausible that they could have thought that is that she disclosed how biased she was. Well, she says that never happened. So if it never happened, then it would seem to be an implausible basis for firing her, wouldn't it? For not hiring her. I would agree with you, Your Honor, if that was the sole basis upon which the decision not to hire her rested. But I think this record makes it very clear that there was a number of different reasons, a number of multifactored... Well, let me give you another example, counsel. She says that prior to the interview, she was specifically told that she didn't have to talk about retaliation. And she also says that she didn't have to say anything about Bridgewater specific. And she didn't. The other applicant, however, was rewarded for talking about two of the things that she was specifically told not to address. Doesn't that go to implausibility of the explanation? I hear what you're saying, Your Honor. And to the extent there is record evidence in this case, and to the extent that BSU set up these interviews, set up the mock interview portion of this application process in a way that was not even handed across the board, I agree with you that that would be problematic. But I think in this case, what that would be overshadowed by is the remarkable amount of evidence there still exists as to why Ms. Brawley is the employer. Well, isn't that for the jury? In a case like this, Your Honor, I would say no. Because in this case, Ms. Tate is arguing that pretext and discriminatory animus, her burden on phase three, comes exclusively from the weighting or the comparison of her qualifications with the qualifications of Ms. Brawley. Where that is what you're resting on for purposes of establishing pretext and or employment is that your qualifications must be so widely disparate that no reasonable— What happens in the interview that's undisputed that so clearly favors Ms. Brawley? In other words, if we take off the table this point about Ms. Tate having disclosed her bias, and if we take away the ability to elicit information about the retaliation of Bridgewater specific stuff, because there's disputes over fact about whether we should be taking account of that, what's left in the record about what happened at the interview that would so overwhelmingly show Brawley did better that we should overlook the paper qualification differential? So, thank you, Your Honor. Aside from the— Four minutes remaining. Thanks, Dan. Aside from the ratings that were received by the two candidates where Ms. Brawley received on the whole eight times more exceptional ratings than the other candidate, than Ms. Tate, I would submit that the evaluators' written comments about their performance just from beginning to end reflected their uniform of perception that Ms. Brawley outperformed Ms. Tate during the interview. Comments about Ms. Brawley's performance included things like definitely a top choice for this position. She can undoubtedly hit the ground running. Can we hire her today? Whereas comments about Ms. Tate's performance, albeit still positive, noted things that she, for example, during the mock investigation, she seemed to form her opinion and go to action too quickly, even before getting enough evidence to be able to fully substantiate the professor's biases. She infused her personal opinions into the questioning rather than taking on the role of a neutral fact finder. She was not neutral and had already determined the professor was in the wrong without questioning him. These are objective notes taken during her performance that have nothing to do with the content necessarily of her performance, but rather the procedure with which she deployed her performance. Those were concerns to BSU. They were hiring somebody for an investigative position. They wanted somebody that would always appear neutral and deploy a neutral investigation strategy based on the content of the interviews, based on the content of these performances. I think there is perfectly adequate sufficient evidence in this record to support the legitimate non-discriminatory basis of BSU for hiring Ms. Brawley. And again, on the third prong of this analysis, the question becomes, would a fact finder, would a juror conclude that no reasonable employer in BSU's position could possibly have this record? That is the standard. It's not simply, did she have better qualifications overall? The question is, and this all comes from the Rathbun decision, your honors, First Circuit 2004. The question is, in the absence of objective evidence like test scores, proof of competing qualifications will seldom in and of itself be sufficient to create a triable issue of pretext. The qualifications gap must be so stark, so widely disparate, that no reasonable employer would have made that same decision. I apologize, was there a question? I guess I'm still trying to figure out if the evaluations were done based upon one candidate being given one set of instructions and the other a different set of instructions, and that the instructions that Ms. Brawley were given were weighted heavily in her favor because she did what Ms. Tate was told not to do. What are we supposed to do with that? How are we supposed to view that? I hear your concern, Judge Thompson. Certainly that would be concerning if that were the way that BSU had set up these interviews. I think in this case, however, the great majority of the evidence in the record shows that Ms. Tate underperformed in ways beyond those concerns. Aside from typographical errors in her presentation, aside from going to judgment too quickly during her mock interview, it was not simply that she underperformed because, as she suggests, she was given different instructions. But suppose she had been given the same instructions that the other candidate, so that maybe her rating would have been boosted if she were judged by the same thing that the other candidate was in part at least judged by. I hear you, and certainly that could be theoretically the case that she may have gotten a boost in ratings had she been given the same instructions, which she says she was not. But again, I think the majority of the interview process and the evaluators' rankings reflect that she suffered in ways far greater than just what are being raised as concerns, you know, as disputed issues of material fact. Again, I think at the end of the day, the standard that has to get applied here is whether based on this record, based on these undisputed facts, whether any juror would reasonably conclude that no employer in BSU's position would hire Ms. Frawley. And I thank the court. If you have more questions, I'm willing to entertain them, of course. How many people were interviewed total? So I recall that there were five folks that were welcome to come to the campus to participate in the in-person interview portion. Were all the other candidates white? No. In fact, Your Honor, as pointed out by my brother counsel, BSU invited to the campus four other candidates, all from minority race, I believe. I believe Ms. Frawley was the only white candidate. Do we know anything about whether they got similar instructions with respect to what they should address that were akin to what Frawley received or more akin to what Tate received? So I apologize, Your Honor. I was not the counsel of record when this was in the trial court level, but I also would tell the court that the record on appeal does not seem to reflect any information or documentation about their interview performance. I just have one more question. The interviewers, what were they advised? Were they advised as to how to evaluate the candidates? Again, Your Honor, that's a very good question. I don't know whether there's any information in the record as to how they were instructed to perceive these presentations or evaluate the presentations. As Your Honor well knows, the record on appeal does include their rating sheets. They were all given the same rating sheets with the same questions to provide ratings for and then a comment section where they could sort of provide subjective responses. It was an evaluation panel that was pretty large. I think there were seven, eight or nine evaluators. This was a robust interview process, but I don't think the record to your question directly includes any information as to what they were specifically instructed on prior to each person's presentation. I'm curious because their ratings talk about Ms. Frawley talking about retaliation and Ms. Tate is saying that she was told not to discuss that. My assumption and I think the reasonable inference is that if the evaluators were told this wasn't part of it, they wouldn't have brought it up. Well, surely I think it's fair to infer that if there's a note in the evaluation sheets that Ms. Tate mentioned something, I don't see any reason to doubt that that was that evaluator's perception that she did in fact mention that item. I'm sorry, Ms. Frawley. Oh, Ms. Frawley. That was your question was about Ms. Frawley mentioning retaliation. Yes, and Ms. Tate being told not to mention it, but the evaluators giving points to Ms. Frawley for bringing up something Ms. Tate was told not to bring up. I see what you're saying. So again, to the extent that that is an issue in dispute, again, I think that the evaluators perception of their performance could be colored by, of course, the instructions that the individual candidates were given, but I think, again, on the whole, it's beyond the content of these specific pieces. I think the evaluators overall ratings of these two candidates were so vastly different in favor of Ms. Frawley that I don't think that could have been suggestive enough to make up the difference. Mr. Luccio, was the plaintiff pro se throughout the district court proceedings? That is my understanding, Your Honor. A former assistant attorney general of my office was in the district court. I do believe Ms. Tate then proceeded to file her notice of appeal from the summary judgment order pro se, and while this case was pending on appeal here at the First Circuit, she was appointed counsel. And I know that certain records were produced on behalf of the defendant. Was there any deposition in practice? There was, Your Honor, from the record as I received it, I understand that the assistant attorney general representing the defendant did take the deposition of Ms. Tate, but I believe that was the only deposition taken in the case. Ms. DeBobas, who is an administrator at BSU, testified through affidavit as part of the record here on appeal, but I do not believe there were any further depositions conducted either by BSU or by Ms. Tate. And while Ms. Tate conducted no depositions, correct? That is my understanding. Notwithstanding that Ms. Tate is a lawyer and does have a JD and was representing herself, she chose not to take any depositions while this case was pending through discovery. Okay, thank you. Thank you, Your Honors. Thank you, Mr. Luccio. At this time, if you could mute your device, and we'll hear from Mr. Barkai, his three minutes of rebuttal. Please reintroduce yourself on the record. Thank you. Yotam Barkai, appointed counsel for plaintiff appellant Brenda Tate. I would like to start briefly by addressing a couple of the factual questions that were raised at the conclusion of the previous argument. BSU received 85 applications for the position and conducted 16 phone interviews, and then there were five finalists who were and of those five, Ms. Frawley was the only white finalist and she received the position. And to address one other factual question, yes, Ms. Tate represented herself pro se throughout the proceedings below, and there were no other depositions, at least to my knowledge, other than the one of Ms. Tate. I'd like to make a couple of points. The first is that this is not a case, contrary to what Mr. Luccio was saying, where we're only speaking about paper qualifications. So the Rathbun case actually acknowledges that paper qualifications alone could create a tribal issue, but this is not that case. We do have a number of disputed facts, many of which we've been discussing already. So the central among those are whether Ms. Tate allegedly announced her conclusion during the interview, contrary to protocol, whether Ms. Tate failed to elicit facts from the professor during the mock investigation. And I really want to hone in on a point that Judge Thompson was making. I think she's exactly correct that the performance evaluations, even if we concede that the scores that Ms. Frawley received are higher than Ms. Tate's, those are influenced precisely by those disputed facts and by the fact also in the record, as made in affidavit by Ms. Tate, that Ms. Tate was not instructed to discuss retaliation or to make a presentation applicable to BSU. So what Mr. Luccio describes when he quotes and cites various statements in the performance evaluations in the interview report saying, essentially praising Ms. Frawley and giving her higher scores of four or five, precisely because of those things that Ms. Frawley did that Ms. Tate did not do, that doesn't meet BSU's burden because that is exactly the fact that... I just, I'm not sure I follow that for purposes of the inquiry we're engaged in at the third step. It would make sense to me if there were disparate instructions given and you had comparators of a different race who were given one set of instructions, then you would think that the differential instructions was evident of a disparate treatment type issue. But I'm not sure quite how it relates to proving pretext if there were differential instructions if you don't have comparators. Isn't it just, I mean it doesn't sound like an ideal way to do it for sure, but I'm not sure why it necessarily gives rise to a conclusion of pretext. Well, Judge Barron... One person was given this set of information, this person was told to do the other, they then gave evaluations, the evaluations are the evaluations, they relied on them. It's not pretextual, it's troubling, but if the instructions weren't given out in the differential basis where you've got comparators of different races, then I don't see why it shows pretext particularly. Well, Judge Barron, the question is whether there's a genuine issue as to pretext looking at the facts in sum total. So, the record includes the fact that Ms. Tate was better qualified on paper, it includes the fact that there are these genuine issues of disputed fact as to their comparative interview. They really couldn't have believed she was better qualified and they knew it, so they just stacked it with questions in her favor against her with instructions in order to set it up so she'd look worse off is the idea. It certainly could be that, Your Honor, but that's not the only way to show... Could I ask a question? Um, important to the interview outcome was that they felt she was more of an advocate, your client, than the neutral investigator they wanted. It's a college that's hiring an investigator, presumably when accusations are made against faculty members. They find it significant that she seems to reach a conclusion before she's actually interviewed the faculty member fully. She hasn't elicited enough facts and the picture one gets is that she is shading the outcome of the investigation because she isn't really neutral. That's the picture that the defendants are painting. So, how does the differential instruction about retaliation and about Bridgewater State not talking about either of those, how does that go to those two conclusions which emerge from the interview notes? Judge Lynch, I agree that that's the picture that BSU is attempting to paint here, but those conclusions are based squarely on disputed facts. Ms. Tate says that she did not announce her conclusion during the interview and she disputes that. That's one of the disputed facts that goes to create a genuine jury issue. So, when the interview performance reports rely on that disputed fact or when BSU now as part of their proffered reason for hiring Ms. Frawley relies on those facts, that undermines the plausibility of that proffered explanation. How is that going to work if we give that to a jury? In other words, is Bridgewater State saying there was some concrete statement where she revealed her bias or are they just saying their impression was she was reaching a conclusion too quickly? She says I wasn't. There's no tape of the interview. That starts to sound more like what your opponent was suggesting which is that they believed she was doing that. So, there's nothing that you can put forward to undermine that belief. You get a feeling from somebody. You watch them doing it. You think this person seems a little bit too quick on the conclusion. It's not like she said X. Your Honor, I think that the interview reports do fairly read say that Ms. Tate said X and Ms. Tate said Y. A remand on trial, obviously, the jury can draw credibility determinations if the witnesses are called to testify. Here, the record on summary judgment is not particularly well developed going to the panel's questions about the depositions and so forth. It's certainly a situation where the jury could draw credibility determinations about whether Ms. Tate did say X or didn't say Y. Here, the record is not clear on those points. In fact, Mr. Lucia, during his argument, I think in response to one of the panel's questions, said something like, in fact, the great majority of evidence here goes to show why BSU's proper explanation was not protectional. Of course, the great majority of evidence doesn't do it on summary judgment. If there is any evidence that, in fact, the proper explanation was protectional, then that's the end of the matter. There's a genuine issue for trial. I just want to quickly also point out that the Espinal case, which Mr. Lucia cited during his argument, it goes exactly to what, Judge Barron, you were asking about both of BSU and just now, which is that Espinal was a case where there was a dispute over subjective views of the applicant's performance, but there was no dispute as to whether certain things, in fact, had or had not occurred. That's a very different case from what we have here. Thank you. Any further questions? No, no. Thank you, counsel. Thank you. That concludes arguments for today. This session of the Honorable United States Court of Appeals is now recessed until the next session of court, God Save the United States of America and Dishonorable Court. Counsel, you may disconnect from the meeting.